BARRON, Circuit Judge,
with whom TORRUELLA, Circuit Judge, joins, concurring.
I fully agree with this excellent majority opinion. I write separately to add these thoughts about the growing sentiment that Congress could not have intended for us to apply the increasingly complicated framework that the Supreme Court now requires us to apply in order to determine the scope of the Armed Career Criminal Act (ACCA). In my view, this line of criticism rests on a mistaken premise.
I do not doubt that Congress may have failed to foresee how hard it would be to *62 identify those offenders who, by dint of their past violence, must automatically be subject to the severe sentencing enhancement that ACCA imposes. I do doubt that Congress wanted us to ignore the reality that such a task is a hard one if, in reality, it is. And, experience has shown, that task is hard. For that reason, I think it is important to review Congress’s own role in leading us down this complicated jurisprudential path, which has lately come in for such criticism. That review highlights to me a number of too-easily overlooked problems that the Supreme Court’s current framework for applying ACCA manages to avoid but that otherwise might arise.
I.
First, I realize that the counterin-tuitive results sometimes produced by the categorical approach may appear to be ones that Congress could not possibly have intended, especially given what often appears to be the violent nature of the underlying conduct of the defendant. We should not lose sight of the fact, however, that often “[t]he best indication of Congress’s intentions ... is the text of the statute itself.” S. Port Marine, LLC v. Gulf Oil Ltd. P’ship, 234 F.3d 58, 65 (1st Cir. 2000). And the text of ACCA indicates that Congress did want us to focus on the offense of conviction rather than on the conduct that the defendant engaged in while committing the offense for which he was ultimately convicted. As the Court has observed, ACCA expressly makes the defendant’s “conviction” the trigger for the enhancement and makes no reference to “conduct.” 18 U.S.C. § 924(e)(1) (“In the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense.... ” (emphasis added)); Mathis v. United States, - U.S. -, 136 S.Ct. 2243, 2252, 195 L.Ed.2d 604 (2016).
Second, and relatedly, ACCA’s text expressly tells us that, in focusing on the “conviction,” we should not focus on the label that the state legislature may have given to the underlying criminal offense — no matter how violent-sounding that label may be. In denominating crimes of violence, Congress has said nothing about the labels that states have given to offenses. Congress instead has referred only to the actual elements of the offense. Specifically, Congress, in the definition of “violent felony,” expressly orients us to the elements of the predicate crime: “any crime ... that [ ] has as an element the use, attempted use, or threatened use of physical force against the person of another[.]” 18 U.S.C. § 924(e)(2)(B) (emphasis added).
In light of these aspects of ACCA’s plain text, it seems to me that the case is actually quite strong for concluding that Congress, by writing ACCA the way that it did, intended for us to adopt the focus reflected in the extended line of Supreme Court cases that establishes the categorical approach. After all, there are good reasons to privilege the “conviction” and the “elements” that comprise that conviction over either the label that a state legislature may have given to the offense or the nature of the defendant’s conduct in committing the underlying offense. As the Court has observed, such a categorical— some might say, abstract — focus for the inquiry avoids some very real problems that otherwise would arise.
It must be remembered in this regard that the label that a state legislature gives to a criminal offense is not necessarily a good guide for determining whether a con- . viction is for a violent act. That label is, in many ways, no different from a statute’s *63 title. As such, that label is often a poor proxy for the substance of the underlying legislation. For that reason, there is good reason to be wary of giving an offense’s violent-sounding label much interpretive weight — at least when the label does not reflect the fact that the elements of the offense clearly encompass non-violent conduct. See Bhd. of R.R. Trainmen v. Baltimore & O.R. Co., 331 U.S. 519, 528-29, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947) (“[T]he title of a statute and the heading of a section cannot limit the plain meaning of the text.”).
To be sure, Congress, in focusing on the “conviction” rather than on the defendant’s conduct and on the “elements” of the conviction rather than on its label, may not have expected for there to be as much of a mismatch as there often turns out to be between the label that a state gives to a crime and the elements of that crime. For example, Congress apparently envisioned that the generic offense of “assault” would qualify as a violent felony under what is known as ACCA’s force clause, on the thought that the underlying conduct would invariably be violent. See H.R. Rep. No. 99-849, at 3 (1986) (suggesting that the list of “violent felonies under Federal or State law ... would include such felonies involving physical force against a person such as murder, rape, assault, robbery, etc.”).
But, I do not think Congress’s possible misapprehension about the actual elements of a crime that bears an indisputably violent-sounding moniker supplies a reason for us to conclude that Congress wanted us to ignore the reality that the elements of the crime of conviction often actually cover non-violent conduct. See Popal v. Gonzales, 416 F.3d 249, 254 n.5 (3d Cir. 2005) (“In short, we recognize that our holding today might seem to conflict with Congress’s intent as expressed in the legislative history of § 16. But we believe that this apparent conflict is a mirage, caused by the fact that Pennsylvania has chosen to classify as simple assault offenses that the congressional drafters were unlikely to have had in mind.”). In fact, the crimes at issue in this case demonstrate this mismatch between the level of violence implied by the title of the crime and the level of violence required to commit the crime. Stiffening one’s arm to avoid arrest qualifies as resisting arrest, Commonwealth v. Grandison, 433 Mass. 135, 741 N.E.2d 25, 35 (2001), and an offensive touching, even if slight, qualifies as assault and battery, Commonwealth v. Cohen, 55 Mass.App.Ct. 358, 771 N.E.2d 176, 177 (2002). And, even the government appears to accept that such conduct is not “violent” within the meaning of ACCA.
A state’s choice to expand the scope of its crimes to encompass both violent and non-violent conduct may make great sense in terms of state policy. It certainly makes it easier for state and local prosecutors to make their cases. But a state, in so acting, is not attempting to ensure what Congress is attempting to ensure through ACCA— that armed, repeat, violent offenders are treated especially harshly. Rather, a state that enacts a broad assault or robbery statute is just attempting to ensure that anyone who falls with the scope of that state-defined crime may be punished for that particular crime, broadly defined as it is. As a result, there is no reason to think that Congress would have wanted us to rely on state criminal law labels — when they oversell the actual nature of the prohibited conducted that juries must actually find the defendant to have engaged in — to implement Congress’s attempt through ACCA to single out that class of criminals who are repeatedly violent and thus must be specially punished in consequence. And thus there is no reason to think that, in directing us to look to the elements of *64 state law crimes, Congress, in writing ACCA, did not mean what it said.
Of course, a direct focus on a defendant’s actual conduct could, in theory, solve the “problem” that arises from the frequent mismatch between a crime’s name and a crime’s elements. Sometimes, perhaps often, assaults are violent, even though a jury need not find them to be so in order to convict. But, it must also be remembered that, if the defendant’s conduct alone mattered, then some very real problems still would arise.
For one thing, as the Court has pointed out, a characterization of the defendant’s conduct by a federal judge made well after the conviction could violate a defendant’s Sixth Amendment rights if that characterization would increase the maximum penalty faced by the defendant. Mathis, 136 S.Ct. at 2252. Why, then, should we assume that Congress wished for us to focus on that conduct in applying ACCA, given that it would increase that maximum penalty? Haven’t we long construed statutes to avoid constitutional problems rather than to create them, on the understanding (however fictional it may sometimes be) that Congress is not in the habit of pushing constitutional bounds?
There is also another reason to think that Congress directed us to focus on the “conviction” and its “elements” rather than on the defendant’s underlying conduct in order to avoid a problem that might arise if the focus were on conduct. As the Court has observed, a federal judge’s characterization of a crime as a violent one could be quite unfair to a defendant if it were based only on a years-later review of a defendant’s conduct that is, in turn, based only on agreed-upon facts that were adduced at, say, a plea colloquy.
After all, at the time that a defendant decides to plead guilty to a state crime, the defendant would likely have no real notice of the potentially severe federal consequences of a decision not to challenge the-state’s characterization of the defendant’s underlying conduct. Id. at 2253. For example, the first-time offender cannot be presumed to know that he will later commit two additional state crimes and a federal firearms offense, but it is only after those crimes are committed that the first crime’s violent nature becomes relevant. Thus, a federal district court’s reliance on the description of the conduct from the plea colloquy, despite that lack of notice, could therefore' raise serious due process concerns if the district court did not also give the defendant an opportunity to contest that description of the conduct.
Nor would that notice problem be efficiently solved by affording the defendant an opportunity to contest that description in the federal sentencing proceedings. That approach would invite a mini-trial about the facts of the prior offense years or decades after the fact. See Moncrieffe v. Holder, — U.S. -, 133 S.Ct. 1678, 1690, 185 L.Ed.2d 727 (2013) (“The categorical approach ... promotes judicial and administrative efficiency by precluding the relitigation of past convictions in minitrials conducted long after the fact.”). It is hard to make the categorical approach look like an efficient way of determining which offenses qualify as predicate offenses. A conduct-based approach that, in order to protect the due process interests of the defendant, necessitated searching retrospective inquiries into long-since-passed state court proceedings might well accomplish that seemingly impossible feat.
I suppose that an alternative, more conduct-based framework could, in time, become well known enough to defendants that, in response, they would begin routinely to take care in their state court proceedings to protect themselves from the potential future impact of ACAA. But, *65 even if that quite speculative possibility came to pass, it would give rise to a serious problem of its own.
Such a reaction by defendants to a revised, conduct-focused framework could seriously disrupt the dynamics of the state criminal process, both in plea-bargaining and in trials. The concern would be that, under such a revised legal framework, defense counsel, in developing a record for plea or trial, would no longer focus solely on what would appear to be the state’s only concern: the guilt or innocence of the defendant for the crime for which the defendant was then being prosecuted. Instead, the focus would also be on the federal government’s hypothetical future interest in assessing how dangerous the defendant’s underlying conduct was.
But that focus would interfere with the state’s goals in legislating crimes to contain elements that sweep in non-violent conduct. After all, a state may have chosen to group together both violent and nonviolent conduct under a particular label precisely because it did not want the criminal proceedings to focus on whether the conduct in which the defendant engaged was violent or not. In this way, then, a concern solely of the federal government’s — identifying repeat violent offenders — would distort state court criminal proceedings that, by design, seek to make the violent nature of the conduct irrelevant.
Indeed, a version of this federalism concern seemed to be one that Congress took quite seriously in drafting ACCA. Congress rejected, on federalism grounds, initial legislative plans to formulate an alternative to this enhancement for fear that— by creating a federal crime of robbery and burglary and the like — the federal government would displace the state criminal process. See H.R. Rep. No. 99-849, at 3 (noting that the House Subcommittee on Crime “delet[ed] ... specific predicate offenses ... and added as predicate offenses ... violent felonies under Federal or State law if the offense has as an element the use, attempted use, or threatened use of physical force against a person” (emphasis in original)). Thus, the Court’s current categorical approach — by attending to the textual directives to focus on the “conviction” and the “elements” of the offense— has the virtue of ensuring that ACCA does not give rise to a version of the federalism-based concern about respecting the primacy of state criminal law over a broad range of crimes that we know Congress took quite seriously in crafting ACCA as it did.
II.
Ordinarily, there is good reason to assume that Congress does not intend to enact criminal punishment schemes that are overly complicated. Such complicated schemes may fail to provide defendants with sufficient notice of the consequences of their actions. But the body of jurisprudence that has emerged from Taylor through Mathis does not give rise to this notice-based concern.
The complexity of the categorical approach, as it has developed, is undeniable. This case makes that perfectly clear. But, as this case also demonstrates, in practice, that complexity serves to narrow the scope of this mandatory sentencing enhancement, at least as compared to the breadth that it might otherwise have. Thus, the current categorical approach respects— rather than violates — the notice-protecting principle of lenity that we have long presumed that Congress has in mind when it imposes severe criminal punishment.
Perhaps, insofar as such an enhancement remains in place, there is some alternative to the categorical framework that *66 Congress might adopt that would be superior to the one that the Supreme Court, based on the text of ACCA, requires us to administer. I do not deny that such a framework might be discovered. I do think, though, that we should not discount the very legitimate concerns that led Congress to direct us to focus on the “conviction” and its “elements” — rather than on the defendant’s conduct or on statutory labels — in drafting ACCA. And I think it important, as well, to highlight the related and quite sensible assumptions .that have led the Court to interpret ACCA — and the directive Congress wrote into it — as it has.
The categorical approach is difficult to apply. And its application may in many cases seem to exclude from ACCA’s reach defendants whose past records appear to be violent ones. But, the simple fact is that it is hard to devise a system for identifying those individuals who as a class — and thus regardless of particular circumstances that could be evaluated through individualized sentencing — must be sentenced very harshly because of the violence that they have perpetrated in the past. It is thus important, it seems to me, not to lose sight of the significant ways in which the categorical approach, for all of its faults, reflects respect both for due process and federalism. Otherwise, we may find ourselves, in time, administering a revised framework that, though supposedly improved, actually creates problems more serious than those that it sought to solve.